[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11276

_____

D. C. Docket No. 03-61420 CV-PAS

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
JUNE 27, 2006
THOMAS K. KAHN
CLERK

ROBERT DRAGO,

Plaintiff-Appellant,

versus

KEN JENNE, Sheriff of Broward County, Florida,
BROWARD COUNTY SHERIFF'S OFFICE,

Defendants-Appellees.

_____

No. 05-14866

_____

D. C. Docket No. 03-61420 CV-PAS

ROBERT DRAGO,

Plaintiff-Appellant,

versus

KEN JENNE, Sheriff of Broward County, Florida,
BROWARD COUNTY SHERIFF'S OFFICE,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(June 27, 2006)**

Before BLACK, PRYOR and COX, Circuit Judges.

COX, Circuit Judge:

Robert Drago appeals the district court's grant of summary judgment to the Broward County Sheriff's Office and Sheriff Ken Jenne (collectively, BSO) on Drago's claims under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Florida Civil Rights Act (FCRA), Fla. Stat. §§ 760.01-760.11. Drago also appeals the district court's denial of his Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment. We affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Beginning in July 2000, Drago was a captain in BSO, assigned to District 11, Area 1. In that position, Drago supervised over one hundred and twenty people and was accountable to his superiors for Area 1's operational performance. He was responsible for making periodic presentations to those superiors as part of the Powertrac Rating System. In August 2000, after his first Powertrac presentation,

Drago's superiors expressed concerns about the presentation and his district's performance. After Drago's Powertrac presentation in January 2001, one superior commented that Drago "was not as familiar as he should be with investigations" and recommended "more preparation and organization." (R.2-53, Ex. 1 at 4.)

In March 2001, Major Rick Frey became Drago's direct supervisor. Shortly thereafter, Frey formed the opinion that Drago was insubordinate, disruptive to the command, and undermined Frey's authority as the district chief. In April of that same year, Frey threatened to demote Drago for insubordination and "for not knowing the answer to [Frey's] questions in the morning meetings and [for Drago's] inability to respond." (R.2-55, Ex. 6 at 2.) On July 6, 2001, Frey advised Drago in writing of Drago's performance deficiencies and advised Drago that he had five weeks "to effect some drastic change." (R.2-56, Ex. 4.) Later that summer, other evaluators characterized Drago's attitude during his August 2001 Powertrac presentation as "argumentative," "defensive," "cocky," "irritating," and "borderline disrespectful," particularly when deficiencies were brought to his attention. (R.2-53, Ex. 2.)

On September 18, 2001, Drago gave another Powertrac presentation, during which he again received negative comments about his performance. Lt. Colonel John G. Auer told Drago, "Your district is succeeding and doing very well in spite of you." (R.2-55 at 33-34.) Immediately after the presentation, Frey told Drago that they

3

needed to meet about Drago's performance deficiencies. Rather than meeting with Frey, however, Drago went to breakfast alone and did not return to the command. Because Drago had not communicated to anyone at his command that he would not be reporting to work that day and because no one was able to reach him by telephone or pager, BSO sent a patrolman to Drago's home, where the patrolman found Drago's BSO-issued car in the driveway. After breakfast, Drago had returned home to change his clothes and then had attended an emergency appointment with a psychologist.

On September 19, 2001, Frey recommended to his superior, Lt. Colonel Danny Wright, that Drago be demoted for his repeated performance deficiencies, for the problems noted during his Powertrac presentation the previous day, and for failing to meet with Frey as requested, instead disappearing from the command following the presentation. Frey stated that Drago had "failed to demonstrate the basic leadership abilities required of a Captain within the Broward Sheriff's Office" and that he was immediately relieving Drago of his command and replacing him with another captain. (R.2-56, Ex. 9.)

Later, on the same day, Wright was successful in contacting Drago by telephone. Wright informed Drago that Wright and others at BSO were concerned because they had not heard from Drago since he left the Powertrac presentation the previous day. During that conversation, Drago said that he needed time off from

4

work and was requesting leave; he did not indicate the anticipated length of his absence. After his conversation with Wright, Drago requested an FMLA application from BSO's Human Resources department.

On October 3, 2001, Drago returned to work unannounced. He brought with him a completed FMLA application (signed by his treating psychologist) but no Return to Work Authorization form. Frey and Wright met with Drago and told Drago that they were upset with him for leaving the command without notifying anyone. They threatened to terminate him if he went out on leave again without notice. They also told him that, to officially return from leave, he should have a Return to Work Authorization form signed by the psychologist.

After obtaining the psychologist's signature on the Return to Work Authorization form, Drago returned to work on October 8, 2001. That day, he was reinstated to the position he held prior to his FMLA leave, with no change in rank, pay, or benefits. Drago's request for FMLA leave was retroactively approved on October 11, 2001. Drago was paid for every day of the leave.

On October 8, 2001, the same day he officially returned to work, Drago filed an internal complaint with BSO's Equal Employment Opportunity (EEO) department, on which he checked "age discrimination" and "harassment" as the reasons for the complaint. The EEO complaint stated that Frey was hostile toward Drago and

5

demeaned him, but it did not include any explanation of why Drago believed that treatment was related to Drago's age or how BSO had interfered with Drago's FMLA rights. In November 2001, EEO concluded that Drago's complaint was not meritorious.

By Drago's own account, after he returned from FMLA leave, he continued to receive criticisms of his performance similar to those he had received before the leave. In November 2001, he applied for a position with the Kissimmee Police Department. He was told by his superiors in BSO that he would not be demoted during the pendency of his application with the Kissimmee department but that, if he did not receive the position with Kissimmee, he would be demoted to lieutenant.

Drago did not receive the position with the Kissimmee department and, in January 2002, he was demoted to the rank of lieutenant within BSO. After the January 2002 demotion, Drago did not experience any other change to his rank, title or pay.

In July 2003, Drago filed this lawsuit against the Broward County Sheriff's Office and Sheriff Ken Jenne, in his official capacity, seeking to recover damages from BSO for interference with his FMLA rights and retaliation for exercising his rights under the FMLA, the ADEA and the FCRA. The district court granted summary judgment to BSO. Drago then moved, pursuant to Federal Rule of Civil

6

Procedure 59(e), to alter or amend the judgment. The district court denied the motion. Drago's appeal challenges both the summary judgment for BSO and the denial of his Rule 59(e) motion.

## II. CONTENTIONS OF THE PARTIES

Drago contends that the district court erred in finding that there were no genuine issues of material fact to support his claims that BSO interfered with his rights under the FMLA or retaliated against him for exercising his FMLA, ADEA and FCRA rights. Specifically, Drago takes issue with the district court's findings that he received all the benefits that the FMLA guaranteed him and that he had not shown that his demotion was causally connected to any protected conduct. Drago also contends that the district court erred in denying his Rule 59(e) motion, which motion sought reconsideration of the district court's summary judgment.

BSO contends that the district court correctly granted summary judgment on all of Drago's claims and that it did not abuse its discretion in denying Drago's Rule 59 motion.

## III. STANDARDS OF REVIEW

Review of an order granting summary judgment is de novo. We apply the same legal standards that bound the district court, "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *See Strickland v.*

7

*Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1203 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The decision to alter or amend a judgment is committed to the sound discretion of the district court. *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1267 (11th Cir. 1998) (citing *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992)). Therefore, this court reviews the denial of a Rule 59 motion for an abuse of discretion. *Id.*

## IV. DISCUSSION

### FMLA Interference Claim

"Among the substantive rights granted by the FMLA to eligible employees are the right to '12 workweeks of leave during any 12-month period . . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee,' 29 U.S.C. § 2612(a)(1), and the right following leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position, 29 U.S.C. § 2614(a)(1)." *Strickland*, 239 F.3d at 1206. To state a FMLA interference claim, a plaintiff must demonstrate that he was entitled, under the FMLA, to a benefit that he was denied. *See Strickland*, 239 F.3d at 1207. The denial that Drago complains of is that he

8

wished to return to work on October 3, 2001, but he was prevented from doing so until October 8, 2001. Thus, Drago contends that BSO interfered with his FMLA rights by preventing him from returning to work for two business days.[1]

Having reviewed the record carefully, we conclude that Drago was not denied any benefit guaranteed him by the FMLA.[2] It is true that the FMLA guarantees a person taking FMLA leave the ability to return to his previous position or to an equivalent position after the leave has ended. 29 U.S.C. § 2614(a)(1). However, it is also true that an employee taking FMLA leave must give his employer notice of the probable duration of the condition requiring the leave. 29 U.S.C. § 2613(b)(2). Doubtless, this is to allow the employer to plan for the absentee's job functions to be handled in another way during his absence and to anticipate his return.

---

[1]Drago also complains that BSO interfered with his FMLA rights by denying his non-FMLA vacation requests, which were pending before he took FMLA leave. Drago does not allege that BSO took away any of his accrued vacation time. Rather, he complains only that BSO refused to approve his requests for particular days off from work. The ability to take particular days of non-FMLA vacation is not a right protected by the FMLA and thus, as a matter of law, cannot be the predicate for a FMLA interference claim.

[2]Indeed, because his FMLA application, signed by the psychologist, stated that Drago did not have a serious health condition and that he was able to perform his job functions, it is questionable whether Drago was ever entitled to any FMLA leave. *See* 29 USC §§ 2612 (authorizing FMLA leave due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee"), 2613(b)(4)(B) (requiring that medical certification state that "the employee is unable to perform the functions of the position of the employee."). However, BSO treated Drago's time off from work as FMLA leave.

The district court assumed, for purposes of the summary judgment, that Drago was entitled to FMLA leave. We do the same. For the reasons stated later, Drago's claims fail nevertheless.

9

In this case, Drago appeared at his command on October 3, 2001, FMLA application in hand, announcing that he was returning to work that day, never having informed anyone in BSO of the anticipated duration of his leave or the date upon which he expected to return to work. While he was absent, Drago's responsibilities (significant, given that he supervised over one hundred and twenty people and that his absence came just one week after the September 11, 2001 attacks on the United States) had been reassigned to another captain. The BSO required him to take another two days of leave and return to work on October 8, 2001, with a Return to Work Authorization. This requirement did not interfere with Drago's rights under the FMLA. As stated above, the statute itself contemplates that an employee must give an employer notice of the anticipated duration of the employee's absence. And, the FMLA allows an employer to require that an employee present a Return to Work Authorization form before he returns from FMLA leave. *See* 29 C.F.R. § 825.310(f) ("An employer may delay restoration to employment until an employee submits a required fitness-for-duty certification.").[3]

---

[3]Drago contends (but does not provide evidence) that this provision of the FMLA does not apply in his case because BSO had no uniform policy requiring fitness certifications of employees returning from FMLA leave. But, Drago's own testimony at deposition may be construed to indicate that he knew of such a policy. (R.2-55 at 65.)

Other record evidence provides additional support for our conclusion that BSO was entitled to summary judgment on Drago's FMLA interference claim. First, the Return to Work Authorization that Drago presented, when he officially returned to work on October 8, 2001, authorized him to return to duty on that date, not on any earlier date. Second, when Drago returned on October 8, 2001, he was reinstated to his prior position, without any change in rank, pay or benefits. Finally, BSO paid Drago for all the leave that he took (including the two business days between October 3 and October 8). Drago simply offers no evidence that he suffered any damage as a result of BSO's requirement that he take an additional two days' paid leave. This court has previously held that, even where there may have been technical violations of the FMLA, those violations are not compensable where, as here, a plaintiff has failed to demonstrate that he suffered any "adverse employment action" for purposes of stating a prima facie case under the statute. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999). Quite simply, in this case, no interference with FMLA rights occurred. Therefore, summary judgment was appropriately granted for BSO on Drago's FMLA interference claim.

11

**FMLA, ADEA, and FCRA Retaliation Claims**

In order to state claims for discriminatory retaliation, a plaintiff must present evidence that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision. *See Strickland*, 239 F.3d at 1207 ("a plaintiff bringing a [FMLA] retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'") (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999)); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (ADEA and Title VII retaliation) (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993)); *see also Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1389-90 (11th Cir. 1998) (FCRA claims are analyzed using the same analytical framework as Title VII). Only after the plaintiff makes this prima facie case of discriminatory retaliation does the burden shift to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action. *See Hairston*, 9 F.3d at 919. "'If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted,' and 'drops from the case.'" *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.10, 101 S. Ct. 1089, 1095 n.10 (1981)).

It is undisputed that Drago's demotion constitutes an adverse employment decision. Regarding the statutorily protected activity in which he allegedly engaged, Drago does not allege that he was demoted for taking FMLA leave. Rather, he contends that his demotion was retaliation for: (1) his verbal complaints to his superiors that they violated the FMLA by refusing to allow him to return to work for two working days beyond the date on which he wished to return to work, and (2) his written EEO complaint which he maintains "opposed" BSO's refusal to allow him to return to work for two days beyond the date on which he desired to return and in which he complained that he suffered age discrimination. (R.1-1, ¶¶ 33, 36, 41.) We assume for purposes of this appeal (but explicitly do not decide) that Drago's verbal and written complaints constitute statutorily protected activity under the FMLA, the ADEA, and the FCRA. Even so, all Drago's claims of retaliation fail as a matter of law because he has failed to present sufficient evidence that the adverse employment action he alleges (his demotion) was causally linked to the only protected activities in which he alleges he engaged (the verbal complaints to his superiors and the written EEO complaint).

The only evidence Drago has cited to support the causation element of his retaliation claims is that he was demoted approximately three months after

13

complaining to his superiors and filing his EEO complaint.[4] We have previously held that, in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation. *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001). We are not persuaded that three months (only two weeks less than the time we discussed in *Wascura*) is sufficiently proximate to show causation.

Additionally, Drago is unable to present a jury question regarding causation because the record evidence is overwhelming that BSO contemplated demoting him before he ever complained that BSO was interfering with his FMLA rights. Drago himself admitted that, as early as April 2001 (five months before he went out on FMLA leave), Frey considered demoting Drago for performance-related reasons. We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal

_____

[4]Drago attempts to augment his thin evidence of causation with argument that his superiors' anger with him for leaving his command without telling anyone, their threats to fire him if he did so again, and (on September 21, 2001) their disapproval of his vacation requests (in part because he had been out on FMLA leave) evidence the fact that they did not respect his FMLA rights. At most, these facts demonstrate Drago's superiors' frustration that he failed to communicate on September 18 that he was leaving his command (for FMLA or other reasons) and their decision that BSO could not afford for him to be away from the command on the holiday dates he had requested. They are not relevant to show a causal connection between any complaint Drago made (verbally on October 3 or in writing on October 8) and his ultimate demotion.

proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation. *C.f. Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1510-11 (2001)).

Because he fails to present sufficient evidence of causation, Drago fails to present a prima facie case of discriminatory retaliation. Therefore, each of his retaliation claims fails as a matter of law.

## Rule 59(e) Motion

Drago's Rule 59 motion sought amendment of the judgment based on two arguments: (1) that the district court made clearly erroneous factual findings in its order granting summary judgment, and (2) that the district court committed error by granting summary judgment for BSO without requiring BSO to file a statement of facts opposing Drago's summary judgment motion. The district court denied the motion.

We agree with the district court that the arguments in Drago's motion are meritless and therefore hold that the district court did not abuse its discretion in denying the motion.

## V.  CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.[5]

**AFFIRMED**.

---

[5]Defendants maintain that the Broward County Sheriff's Office is not a legal entity.  Given our disposition of the case, we need not address that question.